## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## NORTHERN DIVISION

| | | |
|---|---|---|
| **MATTHEW SHIELDS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 2:19CV60 HEA** |
| | ) | |
| **ANDREW M. SAUL,** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## OPIONION, MEMORANDUM AND ORDER

This matter is before the court for judicial review of the final decision of the Commissioner of Social Security denying the application of plaintiff for disability insurance benefits under Title II, 42 U.S.C. §§ 401, *et seq.* and denial of supplemental security income benefits under Title XVI, 42 U.S.C. §§ 1381, *et seq.* The Court has reviewed the briefs and the administrative record as a whole which includes the hearing transcript and medical evidence. The Court will, therefore, affirm the decision of the Commissioner.

## Background

Plaintiff filed his application for Supplemental Security Income on August 25, 2016, alleging a May 22, 2015 onset date. He was 45 years old on the date of

filing.  He alleged inability to work primarily due to a learning disability, trouble with concentration and memory, and depression.

He was initially denied on September 27, 2016. On February 6, 2018 a hearing was held. Following the hearing, the ALJ issued a decision on September 28, 2018 finding that Plaintiff was not disabled under the Act. Plaintiff filed a Request for Review of Hearing Decision/Order and on May 29, 2019, the Appeals Council denied his request for review. Thus, the decision of the ALJ stands as the final decision of the Commissioner.

## Record Evidence

The following relevant[1] evidence appears in the record:

**Plaintiff's Testimony**

At the hearing, Plaintiff testified that he lived alone in an apartment. Plaintiff testified that he has a driver's license and drives about once a day, although his older sister took him to the hearing. Plaintiff testified that he went to school through twelfth grade and earned a regular diploma; in school, he received speech therapy and was in special education classes. Plaintiff testified that he was not working but that he did help his father deliver meals on wheels once or twice a week. His father drives and Plaintiff takes the meals to the door.

---

[1] Plaintiff only appeals the ALJ's decision as it relates to mental health, accordingly evidence regarding his physical health issues is omitted.

Plaintiff testified that he last worked in 2008 as a full-time temp custodian at a community college. He testified that he had worked in that job for a year when he resigned voluntarily to help take care of his girlfriend's special needs daughter. Plaintiff testified that caring for the girlfriend's daughter was equivalent to full-time hours. He stopped serving as caregiver for the girl later in 2008 because he and his girlfriend split up. Plaintiff also testified that in 2007 he drove a transport van for railway workers. He left that job to care for his girlfriend's daughter after a hospital stay. Plaintiff also testified to previous employment as a part-time custodian at the YMCA and a part-time pallet builder in a sheltered workshop. Plaintiff testified to having no other significant full-time work from 2003 to the hearing date and testified that he has not looked for work since he stopped being a caregiver to his girlfriend's daughter.

When asked what he does in a typical day, Plaintiff testified that he wakes up and checks his blood sugar. Plaintiff then related the events that led to him discovering he is a diabetic: He was living in Princeton and wasn't feeling good so he went to the primary doctor who tested his blood sugar and referred him to the ER. He was also diagnosed with high blood pressure at that time.

Plaintiff was redirected to discuss his typical day. Plaintiff testified that after testing his blood sugar, he goes with his parents to get breakfast and helps them with bills and taking his mom to the bank when needed. Plaintiff then testified to

returning home around 4:00 or 5:00 and helping his older sister cook dinner, although he testified that she does most of the cooking. Plaintiff testified that he does all of the chores and cleaning around his apartment and cooks pizza and hamburgers for himself. As for social activities, Plaintiff testified that he normally talks to friends on the computer about a half-hour per day. As for hobbies, Plaintiff testified that he collects bicentennial quarters and walks to his parents' house about a mile away from his home. He testified that he reads once in a while which is how it's always been, and that he watches TV once in a while. Plaintiff testified about going to the grocery store once a week and going to church on Sundays with his sister. Plaintiff testified that he is on medications for diabetes, high blood pressure, and depression, and takes them as prescribed.

Plaintiff testified that since the last ALJ hearing (related to his previous SSI application) his conditions had changed in that he has good days and bad days with depression, and that "a lot of times I have days I don't leave the house. I just stay around the home all day."

Plaintiff stated that although his family owns a farm in northern Missouri, he, his sisters, and his parents had all recently moved to Marceline, and so he no longer helps on the farm. He testified that his parents asked him to move to Marceline to help them out, and that he helps them by doing dishes and helping

4

clean the house. Plaintiff testified that he was not having trouble taking care of himself before moving to Marceline.

Plaintiff testified that he had trouble putting together pallets at his previous job. In general, he testified that he has sometimes had difficulty learning new tasks on jobs due to his memory in that he has trouble remembering the new task. Plaintiff testified that his memory worsened since his filed his application in August 2016. He also testified that since 2008 or 2009, he has a harder time learning new routines, is more forgetful, and has more trouble concentrating. Plaintiff described his learning disability as being related to his bad memory.

Plaintiff testified that his sister normally reminds him to take his medication but does not help him with things around his apartment. When asked about his case manager, Plaintiff testified that his case manager helps him set goals for him to realize and helps with medication as needed. When asked, Plaintiff indicated that the case manager helps to make sure he gets to his appointments on time. Plaintiff testified to spending one hour twice a month with the case manager.

Plaintiff testified that he has depression and takes Risalti and Trintellix. He testified that he takes those medications as prescribed although his dosage of Trintellix was reduced due to GI upset.

5

Plaintiff testified that he felt could not go back to his previous jobs because of memory loss and troubles remembering. Plaintiff testified that he has never had problems interacting with other people.

**Medical Records**

Plaintiff first saw Nurse Practitioner Rebecca DeVine ("NP DeVine") on November 24, 2015. During that visit, Plaintiff stated that he experienced depression on and off since the 1990s and had attempted suicide once. Plaintiff said he "tunes out" suicidal thoughts, naps during the day, and experiences feelings of worthlessness. Plaintiff felt that the Abilfy he was prescribed helped him. Plaintiff also reported learning disabilities and forgetfulness. NP DeVine assessed Plaintiff's mental status as depressed with minimal insight, borderline intelligence, and mildly impaired ability to make reasonable decisions. Plaintiff's affect, speech, thought process, perception, thought content and cognition were not abnormal. A review of systems revealed fatigue, weight gain, sinus pressure, apnea, headaches, and depression. NP DeVine encouraged Plaintiff to seek psychological therapy to learn coping skills and continued his prescription for 10 mg of Abilify once a day.

Pursuant to NP DeVine's referral to therapy, Plaintiff began seeing Richard Davenport II, LMHC at the Community Health Center of Southern Iowa for therapy sessions on December 8, 2015. Shields saw Mr. Davenport at least once every month between December 2015 and September 2017. During his December

6

8, 2015 therapy intake, Plaintiff stated that his reasons for visiting were depression and his learning disability. Plaintiff said he lived alone in a senior/disability apartment and was satisfied with his current living situation. Plaintiff reported that he was unemployed, not looking for work, and that his social security disability was on appeal after three years. Mr. Davenport observed Plaintiff's demeanor as generally normal, and assessed his mental status as depressed with borderline intelligence, partial insight, and a mildly impaired ability to make reasonable decisions. Mr. Davenport identified the following need areas in his functional assessment of Plaintiff: employment, education, anger/aggression, dependency on family, anxiety, coping/symptom management skills, and cognitive problems related to his borderline intellectual functioning; Plaintiff indicated that he desired to change all of these areas, and stated his goal for treatment was to feel better. He identified his memory problems as a barrier to his goal. Mr. Davenport determined that Plaintiff would benefit from learning coping skills.

During a December 22, 2015 visit with NP DeVine, Plaintiff said he was doing good and denied any problems. He reported that medication seemed to be working without side effects and denied additional symptoms. He also said therapy was helping. NP DeVine instructed Plaintiff to continue with Abilify and therapy.

On December 29, 2015, Plaintiff told Mr. Davenport that his medication was working well and that he was practicing coping skills to control his anger and

depressive symptoms. Plaintiff reported feeling like an 8 out of 10 mentally, with 10 meaning feeling fantastic mentally. Mr. Davenport recorded Plaintiff's mood as "Depressed" and noted that his ability to make reasonable decisions was mildly impaired.

On January 13, 2016 Plaintiff visited his primary care provider ("PCP"). The PCP noted that Plaintiff was cooperative with appropriate mood and affect.

On January 21, 2016, Plaintiff told Mr. Davenport that Abilify was working well as were the coping skills learned in therapy. Plaintiff reported feeling like a 7-8 out of 10, with 10 meaning no depressive symptoms. He also reported that he was keeping his anger in check.

On February 4, 2016, Plaintiff told Mr. Davenport that he was coping well, staying engaged with others, and trying to keep busy with activities during the day. Plaintiff reported feeling like a 6-7 out of 10, with 10 meaning no depressive symptoms. Plaintiff reported liking talk therapy and exploring coping options.

On February 10, 2016 Plaintiff visited his PCP. The PCP noted that Plaintiff was cooperative with appropriate mood and affect.

On February 18, 2016, Plaintiff told Mr. Davenport that he felt like an 8 out of 10 with 10 meaning no depressive symptoms. Plaintiff reported that he was keeping busy to manage his depressive symptoms and was looking forward to

Spring and being outdoors. Mr. Davenport did note that Plaintiff's ability to make reasonable decisions was impaired but within normal limits.

Plaintiff visited NP DeVine on February 23, 2016, reported that everything was "good," and denied any issues. NP DeVine instructed Plaintiff to continue with Abilify and therapy and follow up in three months.

On March 9, 2016, Plaintiff told Mr. Davenport that he was feeling good and doing well with medication. He denied any major mental or physical symptoms. Plaintiff reported looking forward to spring and planning a birthday party.

On March 31, 2016, Plaintiff told Mr. Davenport that he felt like a 10 out of 10 mentally and noted that it has been some time since he felt this good. Plaintiff laughed at times during the session.  Plaintiff said he was helping on the family farm and socializing with his girlfriend and close friends. He reported that he was using coping skills learned in therapy and that his mood was much calmer.

On April 26, 2016, Plaintiff told Mr. Davenport that he was 10 out of 10 mentally and feeling fantastic. Plaintiff said he was working on chores with his father on the farm and found his depressive symptoms lessening as he became more busy with activities.

On May 17, 2016, Plaintiff told Mr. Davenport that he was feeling great mentally and was a 9 out of 10, with 10 meaning no significant mental health issues present. Mr. Davenport wrote that Plaintiff's progress was good, that his

mental status was generally normal, and that he was positive and following through on therapist's advice. Plaintiff reported staying busy with activities on his parents' farm. Mr. Davenport reported that Plaintiff's mood was euthymic and assessed Plaintiff's insight as partial.

At his May 24, 2016 follow-up appointment with NP DeVine, Plaintiff was doing well and was stable, though he presented with poor judgment. Plaintiff reported intermittent symptoms of mild irritability and reported functioning as somewhat difficult. He denied feeling depressed or down. NP DeVine wrote that Plaintiff's depression-related symptoms were well-controlled, and his initial symptoms had improved. She noted that Plaintiff's depression was aggravated by conflict or stress and relieved by good responses to medication and therapy.

During a May 26, 2016 appointment with his PCP, Plaintiff stated that his depression symptoms were well controlled with his current medication. He also stated that he was sleeping well and that his appetite was good. The PCP noted Plaintiff's flat affect.

On June 7, 2016, Plaintiff told Mr. Davenport that he felt like a 10 out of 10, with 10 meaning no significant mental health symptoms. Plaintiff felt that his medication was working well. He reported using his support system and being active in the community. Plaintiff's mood was euthymic. Plaintiff stated he was doing well mentally and physically, with which Mr. Davenport agreed. Mr.

Davenport reminded Plaintiff to stay engaged with others at times that he might resort to isolation in his apartment.

On July 5, 2016, Plaintiff told Mr. Davenport that he felt like a 10 out of 10, with 10 meaning no significant mental health symptoms. Plaintiff said he was considering being a caretaker for a friend, and that his social security disability claim had been denied but would be appealed. Plaintiff also reported that his medications were working well, he was using coping skills, and was doing well emotionally. Plaintiff stated long terms goals of getting on disability and having a long-term romantic relationship.

On August 2, 2016, Plaintiff told Mr. Davenport that he felt like a 10 out of 10, with 10 meaning no significant mental health symptoms. Plaintiff said he decided to move to another city to be a caretaker for a disabled friend. Plaintiff reported doing well taking Abilify and using coping skills to manage his depressive symptoms. Plaintiff believed that being a caretaker could help him with his passion and finding purpose. Plaintiff also stated that he had to restart the social security disability process and that a lawyer was assisting him.

On August 16, 2016, Plaintiff had a follow-up visit with NP DeVine. Plaintiff lost six pounds over 3 months. He also had symptoms of fatigue, heartburn, and depression/hopelessness. Plaintiff looked disheveled with depressed mood and constricted affect. Plaintiff said he felt that things overall were good,

although his father had suffered a minor stroke which was hard for him to handle. He hoped to be able to help his parents while his father recovered. He also reported his plan to become a caretaker for a friend fell through when the friend was evicted. NP DeVine ordered Plaintiff to continue Abilify and therapy.

On August 30, 2016, Plaintiff told Mr. Davenport that he felt like a 10 out of 10, with 10 meaning no significant mental health symptoms. Plaintiff said his medication was working well. Plaintiff exhibited depressed mood and partial insight. Plaintiff had attended a concert with a friend and had enjoyed his day out. Plaintiff worked on positive thinking and humor to manage depressive symptoms.

On September 20, 2016, Plaintiff told Mr. Davenport that he felt like a 10 out of 10, with 10 meaning no significant mental health symptoms. Plaintiff said he felt good mentally and felt his medications were working well. Plaintiff exhibited euthymic mood and partial insight. Mr. Davenport noted that Plaintiff required practice of coping skills due to Plaintiff's borderline intellectual functioning.

On October 11, 2016, Plaintiff told Mr. Davenport that he felt like a 9 out of 10, with 10 meaning no significant mental health symptoms. Plaintiff exhibited anxious mood and partial insight. Plaintiff was disappointed that his social security disability was denied. Mr. Davenport encouraged him to think positively. Plaintiff planned to do some chores on his father's farm for the rest of the year.

On November 8, 2016, Plaintiff visited NP DeVine for a follow-up. Plaintiff was experiencing a reemergence of symptomatic auditory hallucinations about 4 times per week. Plaintiff reported that functioning was somewhat difficult. NP DeVine increased Plaintiff's Abilify prescription to 15 mg daily and instructed Plaintiff to continue therapy and follow up in four weeks.

On November 9, 2016, Plaintiff told Mr. Davenport that he felt like a 9 out of 10, with 10 meaning no significant mental health symptoms. Plaintiff exhibited anxious mood and partial insight. Plaintiff stated he was restarting his social security disability claim from scratch after losing his appeal. Mr. Davenport noted that Plaintiff's basic needs were met by his parents financially. Plaintiff also related NP DeVine's increase to his dosage of Abilify.

On December 1, 2016, Plaintiff told Mr. Davenport that he felt like a 9 out of 10, with 10 meaning no significant mental health symptoms. Plaintiff said his Abilify dose had been increased and he was feeling better mentally. He related a good Thanksgiving and looked forward to Christmas. Plaintiff exhibited euthymic mood and partial insight. Plaintiff was unable to identify any goals for 2017 outside of improving a long-distance relationship with a certain woman.

On December 6, 2016, Plaintiff visited NP DeVine for a follow-up. Plaintiff's symptoms were depressed mood, difficulty concentrating, and easily startled. Plaintiff's symptoms were fairly controlled. NP DeVine noted both

continuation and improvement of initial symptoms. Plaintiff was anhedonic, forgetful, and exhibited a deficient fund of knowledge and blunted affect. Plaintiff was oriented to time, place, person, and situation, was not agitated or anxious, and exhibited normal insight, judgment, attention span, and concentration. Plaintiff reported that his increased Abilify dosage had been helpful and denied problems with the medication. NP DeVine instructed Plaintiff to continue therapy and continue 15 mg of Abilify per day.

On January 18, 2017, Plaintiff told Mr. Davenport that he felt like an 8 out of 10, with 10 meaning no significant mental health symptoms. Plaintiff's mood was euthymic. Plaintiff stated that he felt like his life was on hold until he could receive disability benefits. Plaintiff reported spending his time on social media and with his family, doing chores on the farm. Mr. Davenport encouraged Plaintiff to work on social activities.

On February 7, 2017, Plaintiff visited NP DeVine for a follow-up. Plaintiff's symptoms were fatigue, depression, difficulty concentrating, easily startled, feeling down, depressed or hopeless, feelings of guilt, and little interest or pleasure in doing things. Plaintiff was overweight, anhedonic, and exhibited blunted affect. Plaintiff reported lacking motivation and activity. He stated on weekends he went to his parents' house and during the week he mostly stayed home or walked to the library to use the computer. NP DeVine noted that he would benefit from group or

14

community support, and that Wellbutrin or venlafaxine may increase his energy and target his anhedonia.

On February 15, 2017, Plaintiff told Mr. Davenport he felt like a 9 out of 10, with 10 meaning no significant mental health symptoms. Plaintiff's mood was anxious. Plaintiff said he was staying active in the community. Plaintiff felt that nice weather helped him feel better mentally and was looking forward to spring.

On March 15, 2017, Plaintiff told Mr. Davenport he felt like a 9 out of 10, with 10 meaning no significant mental health symptoms. Plaintiff's mood was depressed and anxious. Plaintiff stated that he was assisting his family as needed while waiting for his social security disability hearing.

On April 12, 2017, Plaintiff told Mr. Davenport he felt like a 9 out of 10, with 10 meaning no significant mental health symptoms. Plaintiff felt that all was going well with his medications and felt good about checking in with Mr. Davenport in therapy. Plaintiff explored relaxation techniques and activities to destress. Plaintiff's summer goals were to spend more time outdoors and fish more.

On May 9, 2017, Plaintiff visited NP DeVine for a follow-up. Plaintiff denied anhedonia and other depression symptoms. Plaintiff felt that things were good, although he reported one bad day. Plaintiff had gained 16 pounds in 5 months. Plaintiff exhibited appropriate mood and affect and had normal attention

15

span and concentration, but poor insight. Plaintiff reported that he applied for a job near his parents.

On May 17, 2017, Plaintiff told Mr. Davenport that he felt like an 8 out of 10, with 10 meaning no significant mental health symptoms. Plaintiff said he planned to move to Marceline, Missouri to be near his family. Plaintiff appeared disheveled and his mood was depressed. Plaintiff felt if he moved closer to his family, he would also feel better mentally.

On June 14, 2017, Plaintiff told Mr. Davenport that he felt like a 10 out of 10, with 10 meaning no significant mental health symptoms. Plaintiff said he had no major stressors since his last session. Plaintiff's mood was depressed. Plaintiff identified doing chores on the farm, spending time outdoors, spending time with family, reading and watching movies as activities to keep him busy and help him manage his depression symptoms.

On July 19, 2017, Plaintiff told Mr. Davenport that he felt like a 9 out of 10, with 10 meaning no significant mental health symptoms. Plaintiff related his recent diagnoses of diabetes and hypertension. Plaintiff's mood was depressed. Plaintiff felt that his Abilify was working well to manage his depressive symptoms; he also continued to practice coping skills and reported exercising and taking medication to manage his diabetes.

On August 8, 2017, Plaintiff visited NP DeVine for a follow-up. Plaintiff reported having difficulty concentrating, an inability to focus, and being easily startled. He denied other psychiatric symptoms. Plaintiff had lost 4 pounds in two months with no appetite loss. NP DeVine noted anhedonia, deficient fund of knowledge, blunted affect, poor attention span, and disjointed concentration. She also wrote that Plaintiff was stable on Abilify since November 2015 and that his mood and sleep were good. Plaintiff said he would be moving closer to his parents in September and requested a referral to mental health provider there.

On August 29, 2017, Plaintiff told Mr. Davenport that he felt like a 10 out of 10, with 10 meaning no significant mental health symptoms. Plaintiff appeared disheveled and his mood was depressed. Plaintiff stated he would be moving soon to be near his family and planned to transfer to mental health and medical providers there. Plaintiff also said his depression was improving with medication and therapy.

On September 26, 2017, Plaintiff told Mr. Davenport that he was a 9 out of 10, with 10 meaning no significant mental health symptoms. Plaintiff's mood was depressed; all other mental status measures were not abnormal. Plaintiff said he was moving to be closer to family, was looking forward to the move, and had appointments with mental health professionals near his new home.

On October 3, 2017, therapist Connie Heaney, MSSM, LMSW performed a mental status exam and an initial psychosocial assessment of Plaintiff. Ms. Heaney noted that Plaintiff's hygiene and grooming were fair to good, he made good eye contact, he was cooperative, and his flow of thought was normal. Plaintiff exhibited decreased motor activity, mildly reduced speech, and even to mildly blunted affect. Plaintiff said he felt "really good," which Ms. Heaney noted as somewhat incongruent with his presentation. Plaintiff was oriented to person, place, time, and situation, had normal thought content and fair insight and judgment, and exhibited normal to mildly below normal intellect. Plaintiff stated he was transferring services from his former providers in southern Iowa. Plaintiff reported having depression and suicidal thoughts that he tries not to think about. He related two suicide attempts in 2000 and a diagnosis of moderate depression around 2012-2013 after having fought depression for quite a while. He had also been diagnosed in the past with Major Depressive Disorder. Plaintiff reported the following symptoms on the day of his assessment: feeling down, depressed, or hopeless, feeling tired or little energy, overeating, trouble with concentration, and feeling fidgety. Plaintiff denied suicidal thoughts. He also reported that taking 15 mg of Abilify each day was helping him and decreased his depressive symptoms. Plaintiff also related a diagnosis of Borderline Intellectual Functioning, and said he had an IEP in school and learning disabilities. Ms. Heaney noted that Plaintiff had

some indications for Generalized Anxiety Disorder but did not meet the full

criteria thereof and assigned anxious distress to Plaintiff's Depression diagnosis.

Plaintiff also said he was not currently working and had not worked since 2015. He

reported that he was trying to look for jobs and that he had applied for social

security disability but had been denied and was in the appeals process. Plaintiff

reported a good relationship with his family. Ms. Heaney noted Plaintiff's financial

dependence on his parents financially as adversely affecting his motivation to do

things and his coping skills. Ms. Heaney opined that it was medically necessary for

Plaintiff to receive mental health support services due to past suicide attempts and

needs for coping mechanisms and psychiatric medication management. Ms.

Heaney's treatment recommendations for Plaintiff included working on physical

health goals and his disability appeal with Community Support Specialist ("CSS")

Brittany Standley, attending therapy with Ms. Heaney, and referral to a doctor for

evaluation and medication management. Ms. Heaney assessed Plaintiff's prognosis

as good due to his family support system. In a Daily Living Activities – 20

assessment regarding Plaintiff, Ms. Heaney indicated that Plaintiff had "Severe"

impairment in the areas of managing money and coping skills and "Moderately

Severe" impairment in the areas of health practices and problem solving, with all

other areas having "moderate" or "mild" impairment.

On October 11, 2017, Plaintiff met with CSS Brittany Standley. Plaintiff was appropriately dressed, appeared with optimal hygiene, maintained good eye contact, and appeared disheveled. Plaintiff related a previous depression diagnosis and said he thought the medication he was on for depression was working pretty well. Plaintiff reported that he had tried to apply for disability due to an intellectual disability and was appealing the disability denial, stating, "I'm right on the edge of qualifying they said."

At an October 25, 2017 meeting with CSS Standley, Plaintiff was appropriately dressed, maintained good eye contact, and had unkempt hygiene and grooming. CSS Standley helped Plaintiff contact the state about his eligibility for certain services. Plaintiff made the phone call and CSS Standley helped him answer pre-screening questions. Plaintiff also talked about helping his dad deliver Meals on Wheels. He said doing so was a way to spend time with his father and that he liked helping other people.

At a November 22, 2017 meeting with CSS Standley, Plaintiff was appropriately dressed with unkempt hygiene and grooming. Ms. Standley helped Plaintiff fill out paperwork for his psychiatric appointment and encouraged him to remember the paperwork for his appointment.

On November 29, 2017 Dr. Suzanne King performed a psychiatric evaluation of Plaintiff. Dr. King noted that Plaintiff's chronic history of depression

dating back many years. Plaintiff reported anxiety symptoms including being easily frustrated by daily tasks that require some thinking skills. Dr. King noted that Plaintiff had borderline intellectual functioning and graduated from high school in special education. She also noted that Plaintiff was pursuing full disability, had moved recently to be close to family, and lived in an apartment next to his sister. Plaintiff described some ongoing depression and reported being on 15 mg Abilify for some time. Plaintiff said he was previously on Celexa but it gave him poor sleep and made him hyper. Plaintiff reported sleep problems of waking up too early in the morning. He also stated occasional phobias about band-aids and needles. Plaintiff was concerned with his weight and diabetes and said he was trying to adopt a lifestyle with proper diet and exercise. Plaintiff also described chronic mild cognitive difficulties including trouble remembering and trouble maintaining attention.

At the November 29 evaluation, Plaintiff appeared age appropriate, was cooperative, had good hygiene, had normal rate, tone, and volume of speech, and was alert and oriented to person, place, time and situation. Dr. King noted some poverty of both speech and content of speech, as well as a below average fund of knowledge and limited memory for both the recent and remote. Plaintiff showed fair attention, concentration, insight, judgment, and reasoning.  Dr. King listed the following psychiatric diagnoses: moderate major depressive disorder, recurrent

episode with a specifier of moderate anxious distress; unspecified anxiety disorder; generalized anxiety disorder; borderline intellectual functioning; unspecified intellectual disability (intellectual developmental disorder); situational phobia of needles and band-aids; and, unspecified insomnia disorder. Plaintiff's weight gain was noted as possibly secondary to Abilify use. Plaintiff was willing to adjust his medications and Dr. King laid out a medication plan. Dr. King discussed stressors, coping skills, and support system and discussed Plaintiff's need for CBT and mindfulness training in therapy. Dr. King noted that Plaintiff needed to focus on ADLs of proper sleep, diet, and exercise, as well as treatment and mediation adherence.

**Opinions**

On May 14, 2018, Jonathan D. Rosenboom, Psy.D. performed a psychological consultative examination of Plaintiff and completed an SSA Medical Source Statement – Ability to do Work-Related Activities (Mental). Dr. Rosenboom noted that Plaintiff alleged learning disability, memory problems, trouble concentrating and depression as the psychological conditions related to his social security disability application. Dr. Roseboom noted that Plaintiff's mood was anxious and dysphoric, with Plaintiff reporting he was more anxious than usual. Plaintiff's speech had moderately variable volume and reduced productivity. He was passive and socially avoidant but developed an adequate working and

interpersonal relationship with Dr. Rosenboom. Dr. Rosenboom noted that he was an average historian and informant and did not seem to exaggerate or minimize the severity or frequency of his mental symptoms. In response to Dr. Rosenboom's questioning about his most grievous mental disorder symptoms over the last few months, Plaintiff complained of depressive symptoms, adding that his depression "goes back to the 90s, I've had it most days since then." He also complained of recent problems with irritability and anger and added that he "used to do something about it," hitting walls mostly. Dr. Rosenboom asked if Plaintiff's mind played tricks on him, to which Plaintiff replied he heard voices that seemed to be coming from inside his head calling his name, "only once in a great while now, but frequently before." Plaintiff stated the voices did not talk to him or tell him to do anything, nor did he talk to them. Plaintiff also reported that he "used to see people that weren't there." These were deceased people Plaintiff knew before they died, like his grandparents and great-grandparents. Plaintiff denied any current suicidal thoughts or plans but reported that before he began taking antidepressants routinely in 2008 or 2009, he had suicidal thoughts a lot. Plaintiff reported that he tried to hang himself once ion 2007 but stopped at the last minute. As for social stresses, Plaintiff reported no money and living in a Section 8 apartment, with his parents helping him financially. Dr. Rosenboom administered a PHQ9 screening instrument addressing signs and symptoms of Major Depressive Disorder and a

GAD7 addressing the signs and symptoms of Generalized Anxiety Disorder. The raw scores of both screening instruments fell into the normal/unimpaired range, indicating normal experiences of depressive and anxious symptoms. The screens showed that following symptoms occurred more than half of the days over the previous two weeks: hypersomnia, concentration problems, feeling down or depressed, trouble relaxing due to tension, and easily annoyed or irritable. Dr. Rosenboom administered the Wechsler Brief Cognitive Status Exam ("BCSE"); Plaintiff's score fell into the borderline range which is not significant for cognitive impairment. However, Plaintiff was significantly impaired on concentration and mental control as well as visuomotor construction and planning abilities. His delayed, incidental memory was unimpaired. Plaintiff reported that he was first prescribed antidepressants in 2003 or 2004, has been consistently taking psychotropic meds since 2009, and has achieved an estimated 60% reduction in the severity of his mental disorder symptoms. Plaintiff reported being placed in special education classes and attending custodial training in high schhol-based vocational training. He reported working in the custodial field on and off from 1985 through 2008. Plaintiff reported that he stopped working as a custodian in 2008 in order to take care of his girlfriend's disabled daughter. When Dr. Rosenboom asked why he had not recently sought employment, Plaintiff replied, "I have been having problems learning new things, and concentrating, from a learning disability. And I

24

have been concentrating on getting my SSI." Dr. Rosenboom indicated a principal DSM-5 diagnosis of Major depressive disorder, recurrent, severe with psychotic features, in substantial remission. He also indicated DSM-5 diagnoses of Persistent depressive disorder and probable Borderline intellectual functioning. Dr. Rosenboom assessed Plaintiff as having no deficits or impairments in the areas of: ability to understand, remember, and apply information, and carry out instructions; the ability to adapt and manage oneself; and, capacity to manage his finances. For Plaintiff's ability to interact with others, Dr. Rosenboom found Plaintiff to be slightly passive and avoidant but not significantly so; he opined that Plaintiff was mildly limited in interacting appropriately with the public, supervisors, and co-workers. For Plaintiff's deficiencies of concentration, persistence, or maintaining pace, Dr. Rosenboom noted no problems with persistence or maintaining pace, but also noted that deficient concentration may have contributed to Plaintiff's low score on the BCSE mental control subtest.

On December 9, 2016, NP DeVine completed an SSA Medical Source Statement – Mental regarding Plaintiff. NP DeVine identified Plaintiff's mental diagnoses as Major Depressive Disorder and Borderline Intellectual Functioning. The form includes a section entitled "What the patient can do despite his or her impairments" which consists of an ability with corresponding check boxes labeled "mildly limited," "moderately limited," "markedly limited," and "extremely

limited." NP DeVine did not indicate that Plaintiff was "extremely limited" in any ability area. She indicated that Plaintiff was "markedly limited" in: the ability to understand and remember detailed instructions; the ability to carry out detailed instructions; the ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; and, the ability to respond appropriately to changes in the work setting. NP DeVine indicated that Plaintiff was "moderately limited" in: the ability to understand and remember very short and simple instructions; the ability to carry out very short and simple instructions; the ability to maintain attention and concentration for extended periods; the ability to interact appropriately with the general public; the ability to travel in unfamiliar places or use public transportation; and, the ability to set realistic goals or make plans independently of others. In all other ability areas, NP DeVine indicated that Plaintiff was mildly limited or not limited. NP DeVine selected "clinical findings" and "diagnosis" as the factors on which her choices were based.

The record contains a Social Security Disability Evaluation of Plaintiff dated July 19, 2011 and signed by Nicholas O. Bingham, M.D., M.S., Plaintiff's chief complaints at this evaluation were memory problems, learning disability, and left knee pain. As far as mental issues are concerned, Plaintiff stated that he spent his entire school career in special education, that he must write things down due to

memory problems and could not remember process steps and job duties when he was a custodian, and that he had suffered from depression since 1995, including one past near-suicide attempt. He reported that he still had occasional suicidal ideation but could rationally talk himself out of taking a suicidal step. He had previously taken medications for depression but had a bad reaction to one of them and had not taken medication in several years. Dr. Bingham found that Plaintiff had mild depression, memory problems and a learning disability. Dr. Bingham opined that Plaintiff would need no communicative limitations with respect to hearing or speaking. He also found Plaintiff to be "lower functioning but not profoundly so," and opined that Plaintiff could do well in a sheltered workshop setting or friendly workplace doing simple tasks. Dr. Bingham did not believe Plaintiff was disabled form all occupations.

The record includes an April 12, 2010 psychological consultation of Plaintiff performed by Nora Griffin-Clark, PhD. The consult was performed as part of the disability determination process. Plaintiff reported that he had difficulty learning and was in special education from elementary school through high school graduation. Plaintiff reported depressed mood with some suicidal ideations, irritability, and episodic anger beginning around 2002. He reported trying and discontinuing some medications due to ineffectiveness or side effects. He also reported that he had seen a counselor weekly for six months and participated in

five days of anger management classes. Plaintiff reported that his anger problems had resolved but that he experienced a down mood for an hour or two per day, 5 to 7 days per week, as well as feeling sad or tearful about once a month. He was not seeking further psychiatric help. At the time, Plaintiff lived with his parents and sister and described himself as independent in ADLs, although he reported some difficulty managing money, requiring his parents' help. Dr. Griffin-Clark noted that based on Plaintiff's report of previous employment, his psychiatric symptoms had not impacted his ability to maintain employment.

The record contains a March 20, 1998 psychological evaluation of Plaintiff by Consulting Psychologist Tom Bein, M.S. The evaluation was an intellectual assessment and made no mention of depression or mental illness.

## **Decision of the ALJ**

At Step One of the of the decision from September 28, 2018, the ALJ found that plaintiff had not engaged in substantial gainful activity since August 22, 2016, his application date. At Step Two, the ALJ found that Plaintiff had the severe impairments of major depressive disorder, anxiety disorder, bipolar disorder, borderline intellectual functioning, insomnia disorder, obesity, obstructive sleep apnea, and left foot plantar fasciitis. However, the ALJ found Plaintiff did not have an impairment or combination of impairments listed in or medically equal to one

contained in the Listings, 20 C.F.R. part 404, subpart P, appendix 1, (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

The ALJ determined that plaintiff retained the residual functional capacity to perform light work except he could not use foot controls and should not kneel or crawl. The ALJ also found Plaintiff could occasionally climb, stoop, balance, and crouch and could tolerate occasional exposure to hazards. Also, he could no more than frequently finger bilaterally. The ALJ also found Plaintiff could understand, remember, and carry out instructions for simple, routine, repetitive tasks on a sustained basis with typical breaks, and he could also make simple, work-related decisions.

At Step Four, the ALJ found that plaintiff is unable to perform his past relevant work as a custodian and van driver.  At Step Five, the ALJ found that there are jobs that exist in significant number in the national economy that Plaintiff could perform, such as an inserting machine operator, retail marker, and laundry sorter.  Therefore, the ALJ found Plaintiff not disabled.

## Statement of the Issues

Generally the issues in a Social Security case are whether the final decision of the Commissioner is consistent with the Social Security Act, regulations, and applicable case law, and whether the findings of fact are supported by substantial evidence on the record as a whole. The two issues here are: 1) whether the ALJ

failed to include all credible limitations in the mental RFC; and, 2) whether the ALJ properly considered Plaintiff's subjective reports.

### Standard of Review

The Court's role on judicial review of the Commissioner's decision is to determine whether the Commissioner's findings apply the relevant legal standards to facts that are supported by substantial evidence in the record as a whole. *Pate-Fires v. Astrue*, 564 F.3d 935, 942 (8th Cir. 2009). "Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." *Id.* In determining whether the evidence is substantial, the Court considers evidence that both supports and detracts from the Commissioner's decision. *Id.* As long as substantial evidence supports the decision, the Court may not reverse it merely because substantial evidence exists in the record that would support a contrary outcome or because the Court would have decided the case differently. *See Krogmeier v. Barnhart*, 294 F.3d 1019, 1022 (8th Cir. 2002).

To be entitled to disability benefits, a claimant must prove he is unable to perform any substantial gainful activity due to a medically determinable physical or mental impairment that would either result in death or which has lasted or could be expected to last for at least twelve continuous months. 42 U.S.C. §§ 423(a)(1)(D), (d)(1)(A); *Pate-Fires*, 564 F.3d at 942. A five-step regulatory

framework is used to determine whether an individual is disabled. 20 C.F.R. §
404.1520(a)(4); *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987)
(describing five-step process).

Steps One through Three require the claimant to prove: (1) he is not
currently engaged in substantial gainful activity; (2) he suffers from a severe
impairment; and (3) his condition meets or equals a listed impairment. 20 C.F.R. §
404.1520(a)(4)(i)-(iii). If the claimant does not suffer from a listed impairment or
its equivalent, the Commissioner's analysis proceeds to Steps Four and Five. Step
Four requires the Commissioner to consider whether the claimant retains the RFC
to perform past relevant work (PRW). *Id*. § 404.1520(a)(4)(iv). The claimant bears
the burden of demonstrating he is no longer able to return to his PRW. *Pate-Fires,*
564 F.3d at 942. If the Commissioner determines the claimant cannot return to his
PRW, the burden shifts to the Commissioner at Step Five to show the claimant
retains the RFC to perform other work that exists in significant numbers in the
national economy. Id.; 20 C.F.R. § 404.1520(a)(4)(v).

**RFC**

A claimant's RFC is the most an individual can do despite the combined
effects of all of his or her credible limitations. *See* 20 C.F.R. § 404.1545. An
ALJ's RFC finding is based on all of the record evidence, including the claimant's
testimony regarding symptoms and limitations, the claimant's medical treatment

records, and the medical opinion evidence. *See Wildman v. Astrue*, 596 F.3d 959,

969 (8th Cir.2010); *see also* 20 C.F.R. § 404.1545; Social Security Ruling (SSR)

96–8p.

**<u>Discussion</u>**

Plaintiff first asserts that the RFC is not supported by substantial evidence

because the ALJ did not account for or discuss every limitation in NP DeVine's

SSA Medical Source Statement. Specifically, Plaintiff notes that although the ALJ

afforded significant weight to NP DeVine's opinion and agreed with NP DeVine's

assessments the Plaintiff "would have difficulties with complex tasks and some

changes," the ALJ neither included in the RFC nor discounted NP DeVine's

opinions that Plaintiff  was markedly limited in the ability to perform activities

within a schedule, maintain regular attendance, and be punctual within customary

tolerances, and moderately limited in the ability to interact appropriately with the

general public and in the ability to set realistic goals or make plans independently

of others. Plaintiff argues that the ALJ should have provided reasons for

discounting these limitations or included them in the RFC assessment.

The ALJ did not err by omitting without specific explanation some of the

limitations opined by NP DeVine because NP DeVine is not a treating physician

and the RFC is supported by substantial evidence. It is the ALJ's responsibility to

determine a claimant's RFC based on all relevant evidence, including medical

32

records, observations of treating physicians and others, and claimant's own descriptions of his limitations. *Pearsall v. Masanari*, 274 F.3d 1211, 1217 (8th Cir. 2001). The RFC overall is only required to "include those impairments which are substantially supported by the record as a whole." *Goose v. Apfel*, 238 F.3d 981, 985 (8th Cir. 2001). The ALJ must look at all of the evidence when making an RFC assessment, not just NP DeVine's opinion. SSR 96-8P, 1996 WL 374184, at *1 (Soc. Sec. Admin. July 2, 1996).

　　If the RFC conflicts with a medical source opinion, the ALJ must either account for all such evidence in the RFC or give reasons for discounting it. SSR 96-8p, 1996 WL 374184 at *7 (July 2, 1996). "The term 'medical sources' refers to both 'acceptable medical sources' and other health care providers who are not 'acceptable medical sources,'" such as nurse practitioners. SSR 06-03p, 2006 WL 2329939 (August 9, 2006). [2] Opinions from medical sources who are not technically deemed "acceptable medical sources" "are important and should be evaluated on key issues such as impairment severity and functional effects, along with the other relevant evidence in the file." Id. at *3. "[T]he adjudicator generally should explain the weight given to opinions from these 'other sources,' or otherwise ensure that the discussion of the evidence in the determination or

---

[2] SSR 06-3p has been rescinded, and the rescission is effective for claims filed on or after March 27, 2017. 82 Fed. Reg. 15263-01, 2017 WL 1105348 (Mar. 27, 2017). Plaintiff's claims were filed before the effective date of the rescission; therefore, SSR 06-3p applies here even though ALJ's determination was filed after the effective date.

decision allows a claimant or subsequent reviewer to follow the adjudicator's

reasoning, when such opinions may have an effect on the outcome of the case." Id.

at *6.

       The ALJ afforded significant weight to NP DeVine's evaluation, noting that

NP DeVine had the opportunity to interact and observe Plaintiff's functioning

while treating him. The ALJ noted the marked limitations identified by NP DeVine

as "difficulties with detailed tasks, maintaining a schedule, and responding to

changes in the work setting." The ALJ agreed with the opined limitations regarding

complex tasks and responding to changes, and thus in the RFC "limited the

claimant to simple, routine, repetitive tasks and simple work-related decisions."

The ALJ neither explicitly discounted nor included in the RFC NP DeVine's

opined marked limitation in maintaining a schedule or moderate limitations in the

ability to interact appropriately with the general public, in the ability to set realistic

goals or make plans independently of others, in the ability to understand and

remember very short and simple instructions, and in the ability to carry out very

short and simple instructions.

       It is notable that NP DeVine's opinion as to Plaintiff's limitations was

presented on a checkbox Medical Source Statement form without elaboration or

mention of supporting evidence. Such checkmarks on a form "are conclusory

opinions that may be discounted if contradicted by other objective medical

34

evidence in the record." *Martise v. Astrue*, 641 F.3d 909, 926 (8th Cir. 2011). The checked box has little evidentiary value when it "stands alone," cites "no medical evidence, and provides little to no elaboration." *Hogan v. Apfel*, 239 F.3d 958, 961 (8th Cir. 2001); *see also Wildman v. Astrue,* 596 F.3d 959, 964 (8th Cir. 2010).

Other than NP DeVine's checkbox opinion, the Court finds no record evidence supporting a marked limitation in Plaintiff's ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances. None of Plaintiff's medical or therapy records mention tardiness, missed appointments, or attendance problems. In addition, the ALJ's decision is not void of discussion of this limitation: in discussing her findings regarding Plaintiff's limitations in adapting and managing oneself, the ALJ specifically stated that Plaintiff has been able to handle a work schedule and daily routine in the past, assessing only mild limitations in the functional area.

Similarly, the ALJ's determination clearly reflects her reasoning regarding the "moderate" limitations indicated on NP DeVine's Medical Source Statement. For example, the determination discusses the evidence related to Plaintiff's ability to interact with others in detail, including his ability to socialize, to have girlfriends, to go to church and concerts, and to interact appropriately during medical exams, with the ALJ finding only mild limitation in that overall functioning area. The ALJ also cites with great weight Dr. Rosenboom's finding of

only mild difficulties with social interactions. As for his ability to set goals and make plans independently, the determination repeatedly notes that Plaintiff lives independently and takes care of his own needs. Further, the RFC limits Plaintiff to making only simple work-related decisions. As for understanding and carrying out very short and simple instructions, the ALJ credited with significant weight Dr. Watson's evaluation that "specifically opined" about Plaintiff's abilities regarding simple instructions and simple repetitive tasks. Conversely, the ALJ discredited Dr. Rosenboom's opinion that Plaintiff had no difficulties with complex instructions or tasks due to the evidence otherwise in the whole record.

Because the RFC is supported by substantial evidence and the ALJ's determination includes a thorough discussion of the evidence allowing this Court to follow her reasoning, the Court finds no error in the ALJ's discussion of NP DeVine's opinions as to Plaintiff's limitations.

Plaintiff's Subjective Reports

Plaintiff also asserts that remand is required because the ALJ did not provide a meaningful analysis of Plaintiff's subjective reports. The ALJ found that Plaintiff's alleged significant limitations from mood swings, anxiety, and depression were helped by treatment and that Plaintiff's mental condition was managed better than alleged. Plaintiff argues that the ALJ did not address periods of increased depression symptoms, did not consider the consistency of Plaintiff's

initial reports with his statements to medical providers, and improperly picked and chose activities of daily living that supported her conclusion that Plaintiff was not disabled.

When considering a plaintiff's subjective statements about the intensity, persistence, and limiting effects of symptoms, an ALJ is to evaluate whether the statements are consistent with the objective medical evidence and the other evidence. SSR 16-3p, 2017 WL 5180304, at *6 (Oct. 25, 2017). Subjective statements of symptoms need not be disregarded merely because they are inconsistent with the medical evidence, but the ALJ "may discredit complaints if they are inconsistent with the evidence as a whole." *Turpin v. Colvin*, 750 F.3d 989, 993 (8th Cir. 2014) (quotation omitted); *see also* SSR 16-3p, at *5. In examining the record, the ALJ must consider several factors, including the plaintiff's daily activities; the duration, intensity, and frequency of the symptoms; precipitating and aggravating factors; the dosage, effectiveness, and side effects of medication; any functional restrictions; the claimant's work history; and the objective medical evidence. *See Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984); SSR 16-3p, at *7-*8 (incorporating "factors set forth in 20 CFR 404.1529(c)(3) and 416.929(c)(3)"). The ALJ's decision must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any

subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms. SSR 16-3p, at *10. But, an ALJ is not "required to discuss each [ ] factor as long as 'he acknowledges and considers the factors before discounting a claimant's subjective complaints.'" *Halverson v. Astrue*, 600 F.3d 922, 932 (8th Cir. 2010) (quoting *Moore v. Astrue*, 572 F.3d 520, 524 (8th Cir. 2009)).

In discounting Plaintiff's subjective statements regarding his mental health symptoms, the ALJ wrote that Plaintiff was successfully managing his mental health condition with medication and coping skills. Specifically, she noted that although Plaintiff experienced increased symptoms in late 2016, those symptoms improved after an increase in medication dosage. The ALJ also mentioned Plaintiff's own statements to his therapist that his mental health was at a 9 out of 10 and his statements to providers that his medication was working "pretty well." The ALJ also noted that Plaintiff lives independently, takes care of his personal needs, can go out on his own, drives an automobile, goes to church regularly, goes to concerts sometimes, and takes care of his parents' cats and dogs.

The Court rejects Plaintiff's contention that the ALJ failed to consider increases in Plaintiff's symptoms. "Although required to develop the record fully and fairly, an ALJ is not required to discuss every piece of evidence submitted." *Wildman v. Astrue*, 596 F.3d 959, 966 (8th Cir. 2010). "An ALJ's failure to cite specific evidence does not indicate that such evidence was not considered." *Id.* The

ALJ specifically noted that Plaintiff's symptoms increased but were mitigated by a medication increase. As a whole, the record reflects that although Plaintiff's symptoms sometimes increased, they were controlled with treatment, including severe symptoms like auditory hallucinations. An impairment which can be controlled by treatment or medication is not considered disabling. *Estes v. Barnhart*, 275 F.3d 722, 725 (8th Cir. 2002). Moreover, Plaintiff regularly reported feeling good even when mental health providers noted depressed mood, flat affect, poor judgment, and difficulty concentrating. The ALJ did not err by failing to cite every symptomatic finding in the record. Although the record shows that Plaintiff suffers from depression, the severe symptoms alleged by Plaintiff are not supported by substantial evidence.

As for Plaintiff's contention that the ALJ failed to consider the consistency of Plaintiff's initial statements with statements to his medical providers, the Court finds no error. As pointed out by the Commissioner, Plaintiff reports that he has suffered from depression "most days" since the 1990s, yet he worked regularly during that time. In other words, the record indicates that Plaintiff's consistently occurring depression symptoms are not disabling. As for Plaintiff's consistent complaints about concentration and memory, the ALJ included provisions in the RFC to account for Plaintiff's credible limitations.

Finally, Plaintiff argues that the ALJ picked and chose activities of daily living that supported her finding that Plaintiff was not disabled. Plaintiff specifically argues that the ALJ omitted Plaintiff's testimony that he has good days and bad days with depression and does not leave the house some days. The Court agrees that "[m]ental illness is episodic by nature, symptoms can wax and wane, and an individual can have good days and bad days, such that a snapshot of any single moment may indicate little about the individual's overall condition." *Freeman v. Colvin*, No. 4:15-CV-00968-NKL, 2016 WL 4620706, at *5 (W.D. Mo. Sept. 6, 2016). However, Plaintiff did not report problems leaving the house during any of the mental health visits in the record. Rather, the ALJ properly credited Plaintiff's own testimony and statements to medical providers about his daily activities including shopping for himself, helping his father deliver meals on wheels, and attending church regularly.

The ALJ properly acknowledged and considered the appropriate factors in assessing and discounting Plaintiff's depression-related limitations.  The ALJ's decision, although not mentioning every available piece of evidence, nevertheless is clear, contains good reasons for the weight given to Plaintiff's symptoms, and is consistent with and supported by the evidence.

**Conclusion**

For the reasons set forth above, the Court finds that substantial evidence on the record as a whole supports the Commissioner's decision that Plaintiff is not disabled.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is **AFFIRMED**.

A separate judgment shall be entered incorporating this Memorandum and Order.

Dated this 28th day of October, 2020.

_____
HENRY EDWARD AUTREY
UNITED STATES DISTRICT JUDGE